Gary E. Gamel, Esq.
Attorney at Law
2995 Woodside Road, Ste. 400
Woodside, CA 94062
Tele:   (650) 851-1824
Fax:    (650) 745-2430
Email: GaryEGamel@aol.com
California SBN 59387





Of Counsel:

Eric A. Linden, Esq. (Michigan P33249)
Jonathan C. Myers, Esq.  (Michigan P69949)
JAFFE, RAITT, HEUER & WEISS, P.C.
27777 Franklin Road, Ste. 2500
Southfield, MI 48034
Tele:   (248) 351-3000
Fax:    (248) 351-3082
Email: elinden@jaffelaw.com
          jmyers@jaffelaw.com

Counsel for AmericaOne Payment
Systems, Inc.

**C08  01818**   **PVT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| AMERICAONE PAYMENT SYSTEMS, INC., ) | |
| ) | Hon. |
| **Plaintiff,** ) | Case No. |
| vs. ) | |
| ) | |
| ) | **COMPLAINT** |
| FIRST AMERICAN PAYMENT ) | |
| SYSTEMS, L.P., ) | **DEMAND FOR JURY** |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

**COMPLAINT AND JURY DEMAND**

Complaint                    1

AmericaOne Payment Systems, Inc. ("AmericaOne"), by and through its attorneys, states for its Complaint and Jury Demand against Defendant First American Payment Systems, L.P. ("First American"), as follows:

## PARTIES, JURISDICTION AND VENUE

1.    AmericaOne is a California corporation with its principal place of business in Sunnyvale, California.

2.    First American is a Texas limited partnership with its principal place of business in Forth Worth, Texas.  Upon information and belief, no partner of First American is a resident or citizen of California.

3.    Subject matter jurisdiction is proper in this court pursuant to, among other things, 28 U.S.C. § 1332(a) as diversity exists between the parties and the amount in controversy exceeds $75,000.00.

4.    Defendant has done, and continues to do, business in California so that this Court has both general and specific personal jurisdiction over Defendant pursuant to both statutory and Constitutional law.

5.    Venue is proper in this court pursuant to 28 U.S.C. § 1391(a) (2) as a substantial part of the events giving rise to this complaint occurred in the Northern District of California.

## INTRADISTRICT ASSIGNMENT

6.    This case is appropriate for Intradistrict Assignment to the San Jose Division as the Plaintiff's primary place of business is located in Santa Clara County.

Complaint                        2

## GENERAL BACKGROUND

### THE PARTIES

7.      AmericaOne is engaged in the business of marketing and selling credit card processing services to merchants, which allow merchants to accept credit and debit cards for payment of goods and services sold by those merchants.

8.      Defendant is also engaged in the business of marketing and selling credit card processing services to merchants and processing and transmitting electronic data of a financial, banking and economic nature, including, but not limited to, credit and debit card transactions.

### EXECUTION OF THE ISO AGREEMENT

9.      On or about June 20, 2002, AmericaOne and Defendant entered into an Independent Sales Organization Agreement, attached as Exhibit A to this Complaint. The Independent Sales Organization Agreement and the attached Exhibit A are collectively referred to as the "ISO Agreement."

10.     In the ISO Agreement, AmericaOne is referred to as an Independent Sales Organization or "ISO."

11.     The purpose of the ISO Agreement was to "retain ISO on a non-exclusive basis to solicit merchants to utilize First American's electronic capture and transaction processing service." Exhibit A.

12.     Pursuant to the ISO Agreement, AmericaOne agreed to solicit prospective merchants to execute credit and debit card processing agreements (the "Merchant Agreements") with First American.  First American established the prices it charged the merchants for the credit and debit card processing services provided.

Complaint                                    3

## FIRST AMERICAN'S PAYMENT OBLIGATION TO AMERICA ONE

13.     In accordance with the ISO Agreement, First American agreed to pay AmericaOne for each merchant that executed a Merchant Agreement with First American. *See* Exhibit A, Section 8.2.2.

14.     For each Merchant Agreement, AmericaOne was entitled to two separate payments based on the monthly residual income generated by that merchant (the "Monthly Portfolio"). *See* Exhibit A, Section 8.2.2.

15.     In order to calculate the payment obligations under the ISO Agreement, First American would examine the merchant's net revenue for a period of two months after execution of the Merchant Agreement (the "Holding Period").

16.     Pursuant to the ISO Agreement, the first payment was calculated by multiplying the merchant's net revenue of the Monthly Portfolio in the last month of the Holding Period by thirty (the "First Payment"). AmericaOne was, at its option, entitled to an interim payment in the first month of the Holding Period.

17.     The second payment would be calculated based on the average revenues during the second month of the Holding Period plus the average revenues of the eleven months immediately following the Holding Period (the "Second Payment"). AmericaOne was entitled to the Second Payment within fourteen months after execution of the Merchant Agreement.

18.     In April 2004, Defendant arbitrarily, and in violation of the ISO Agreement, changed the method of calculating AmericaOne's payments.

19.     Rather than multiplying the net revenue of the Monthly Portfolio in the second month of the Holding Period by thirty, as required by the ISO Agreement,

Complaint                                    4

Defendant multiplied the net revenue of the Monthly Portfolio in the second month of the Holding Period by twenty eight.

20.     Despite AmericaOne's objections, Defendant continued to violate the ISO Agreement by refusing to pay AmericaOne as required by the ISO Agreement.

21.     AmericaOne was also entitled to payments for all debit card transactions with the payments calculated according to the provisions of the ISO Agreement.

22.     In breach of the ISO Agreement, First American refused to make proper payments to AmericaOne for debit card and related transactions and network fees as required by the ISO Agreement.

23.     AmericaOne made numerous requests to receive reports, daily summaries, and monthly accountings relating to its merchants' actual debit card, network fees, and transaction fees billed.   However, First American, in breach of the ISO Agreement, refused to provide such information to AmericaOne. *See* Exhibit A, Section 8.2.5.

24.     First American's violation of its payment obligations impaired AmericaOne's ability to honor its own payment obligations to its sales agents.

25.     First American was well aware of AmericaOne's obligations and relationships with its sales agents and, pursuant to Section 8.2.2 of the ISO Agreement, "acknowledge[d] that ISO will be forwarding the money to [sales agents] based on the warranty of First American that First American will purchase each Monthly Portfolio and make payments to ISO.  In the event First American fails to fund the purchase of the Monthly Portfolio...First American agrees to liquidated damages...."

26.     AmericaOne is entitled to the liquidated damages as set forth in the ISO Agreement, which was drafted by Defendant, as these damages were a reasonable

Complaint                                                    5

forecast of just compensation due to the difficulty of estimating damages should Defendant fail to pay AmericaOne in accordance with the ISO Agreement.

27.    In or about September, 2005, in further violation of the ISO Agreement (Ex. A, Section 10.4), First American improperly, and successfully, solicited AmericaOne's sales agents and employees, including, but not limited to, Scott McCurry, to terminate their business relationship with AmericaOne and enter into a direct contractual relationship with First American.

28.    AmericaOne has been damaged as a result of lost sales and loss of good will from First American's improper solicitations in violation of the ISO Agreement.

### FIRST AMERICAN'S IMPROPER TERMINATION OF THE ISO AGREEMENT

29.    Pursuant to Section 5 of the ISO Agreement, the ISO Agreement automatically renewed for consecutive one year terms unless terminated by written notice ninety days prior to the existing term.

30.    In or around November 2006, First American notified AmericaOne that the ISO Agreement would terminate on January 1, 2007 unless AmericaOne agreed to execute a new ISO agreement that would modify First American's payment obligations to AmericaOne.

31.    Pursuant to the ISO Agreement, First American was not permitted to terminate the ISO Agreement until June 19, 2007.

32.    Despite AmericaOne's objections, and notice to First American that it did not have a replacement credit card processor, First American terminated the ISO Agreement on January 1, 2007 and refused to accept any new merchants solicited by AmericaOne or its agents.

33.    Despite AmericaOne's diligent efforts, a new processing agreement with a new credit card processing company was not executed and fully implemented until early March, 2007.

34.    Between January 1, 2007 and April, 2007, AmericaOne did not have its products and services sufficiently implemented with its new provider to solicit merchants and train its employees and agents at a scale previously achieved and, as a result, AmericaOne suffered substantial damages including, but not limited to, loss of sales agents, loss of goodwill, loss of merchants and loss of business.

35.    Pursuant to Section 13.4 of the ISO Agreement, AmericaOne is entitled "to recover from [First American] all attorneys' fees, courts costs, expert witness fees, and other costs of enforcement in connection [with the ISO Agreement]."

## COUNT I:
### BREACH OF CONTRACT

36.    AmericaOne incorporates the above allegations as though fully set forth herein.

37.    First American breached the ISO Agreement by, among other things, failing to make the required payments owed to AmericaOne, terminating the ISO Agreement prematurely, failing to provide daily reports, monthly summaries, and other statements reflecting payment calculations, failing to pay AmericaOne properly for credit card, debit card, network fees, and related transactions, and soliciting AmericaOne's sales agents and employees.

38.    AmericaOne has been damaged as a result of First American's breaches of the ISO Agreement.

39.    AmericaOne is also entitled to liquidated damages as set forth in the ISO Agreement.

40.    AmericaOne is entitled to solicit and move merchants it placed with Defendant and is further entitled to Defendant's cooperation in the transfer of those merchants.

41.    AmericaOne is entitled to its costs and attorney fees in accordance with the ISO Agreement.

**COUNT II:**
**UNJUST ENRICHMENT/QUANTUM MERUIT**

42.    AmericaOne incorporates the above allegations as though fully set forth herein.

43.    First American obtained substantial benefits from the services provided to it by AmericaOne.

44.    First American has not compensated AmericaOne for the full value of the services received from AmericaOne.

45.    Allowing First American to retain the benefits of the services provided by AmericaOne without fully compensating AmericaOne would be inequitable.

46.    Allowing First American to retain the benefits of the services provided to it by AmericaOne without full compensation to AmericaOne would result in First American's unjust enrichment at AmericaOne's expense.

**COUNT III:**
**TORTUOUS INTERFERENCE**

47.    AmericaOne incorporates the above allegations as though fully set forth herein.

48.    AmericaOne had valid contracts and/or prospective economic relationships and expectancies with its merchants, sales agents and employees including, but not limited to, Scott McCurry.

49.    There was a reasonable probability that AmericaOne would have entered into contracts with prospective merchants and other economic relationships but for First American's conduct complained of above.

50.    First American, acting without authorization or privilege, and with knowledge of these contracts and prospective economic relationships and expectancies, has, as a result of the actions set forth above, wrongfully and tortiously interfered with these contracts, prospective economic relationships and expectancies.  As a result, AmericaOne has lost contracts and prospective economic relationships and/or expectancies.

51.    First American's intentional and unjustified conduct was motivated by ill will and malice and interfered with and caused breaches and disruptions of AmericaOne's contracts and prospective economic relationships and/or expectancies.

52.    As a result of First American's intentional and improper interference, AmericaOne suffered damages, including, without limitation, damages to its reputation in the credit card processing industry and is also entitled to punitive damages.

## COUNT IV:
### DECLARATORY RELIEF

53.    AmericaOne incorporates the above allegations as though fully set forth herein.

54.    AmericaOne has fully complied with the provisions of the ISO Agreement.    AmericaOne contends that First American is in breach of the ISO Agreement in the manners described above.

55.    As a result of First American's repeated violations of the ISO Agreement, AmericaOne is entitled to solicit those merchants on which it was not fully paid and move such merchants to a third party credit card processor without penalty, and First American is obligated to cooperate in the transfer of such merchants.

56.    An actual, existing and bona fide case and controversy exists between AmericaOne and First American as to their legal rights and obligations following First American's repeated violations of the ISO Agreement and a declaratory judgment is necessary to guide AmericaOne's future conduct.

57.    If AmericaOne's rights and obligations are not adjudicated by way of declaratory action, there will be immediate adverse consequences for AmericaOne.

58.    AmericaOne requests that this Honorable Court enter a declaratory judgment in its favor and declare that First American materially breached the ISO Agreement first, that AmericaOne is no longer required to honor its obligations to First American under the ISO Agreement, including, without limitation, the non-solicitation provisions, declare and order First American to cooperate in the movement of any merchants to AmericaOne's new processor, award whatever amounts this Court deems just, together with costs, interest and attorneys' fees, and award such other and further relief as this Court deems just and equitable under the circumstances.

## COUNT V:
### SPECIFIC PERFORMANCE

59.    AmericaOne incorporates the above allegations as though fully set forth herein.

60.    AmericaOne is entitled to specific performance of the ISO Agreement, including, in particular, the provisions allowing for the movement of merchants to AmericaOne's new processor and the audit obligations of Section 8.2.5.

61.    AmericaOne has no adequate remedy at law under the facts and circumstances of this case.

62.    AmericaOne requests that this Court enter judgment in its favor that directs First American to cooperate in the transfer of merchants to AmericaOne's new processor and directs First American to comply with its audit obligations under Section 8.2.5 of the ISO Agreement.

WHEREFORE, Plaintiff, AmericaOne Payment Systems, Inc., demands as follows:

A.    Judgment against Defendant, First American Payment Systems, L.P., for damages described herein, plus punitive damages, pre-judgment and post-judgment interest;

B.    A declaratory judgment in its favor declaring First American materially breached the ISO Agreement first, that AmericaOne is no longer required to honor its obligations to First American under the ISO Agreement, including, without limitation, the non-solicitation provisions, declare and order First American to cooperate in the movement of any merchants to AmericaOne's new processor, award whatever amounts

Complaint                                 11

this Court deems just, together with costs, interest and attorneys' fees, and award such other and further relief as this Court deems just and equitable under the circumstances;

C.    A judgment in its favor directing First American to specifically perform its obligation to cooperate in the movement of any merchants to AmericaOne's new processor and directing First American to specifically perform its obligation to comply with its audit obligations under Section 8.2.5 of the ISO Agreement;

D.    Its costs and attorneys fees incurred herein; and

E.    All other relief to which it is entitled.

## JURY DEMAND

Plaintiff AmericaOne Payment Systems, Inc. hereby demands a trial by jury for those issues so triable.

Respectfully submitted,

Gary E. Gamel, Esq. (Cal SBN 59387)
Attorney at Law
2995 Woodside Road, Ste. 400
Woodside CA 94062
(650)851-1824
Fax (650)745-2430


Of Counsel:

Eric A. Linden (Michigan P33249)
Jonathan C. Myers (Michigan P69972)
JAFFE, RAITT, HEUER & WEISS, P.C.
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000


Dated: April 4, 2008

*Counsel for Plaintiff AmericaOne*

Complaint                                    12

# INDEPENDENT SALES ORGANIZATION AGREEMENT

THIS INDEPENDENT SALES ORGANIZATION AGREEMENT ("Agreement") is entered into by and between First American Payment Systems, L.P.,(hereinafter referred to as "First American"), with its principal place of business at 301 Commerce Street, Suite 2000, Fort Worth, Texas 76102 and AmericaOne Payment Systems, Inc., an Independent Sales Organization located at 10413 Torre Avenue, Suite 500, Cupertino, CA 95014 (hereinafter referred to as "ISO").

## *WITNESS:*

WHEREAS, First American is engaged in the business of providing designated electronic payment services through First National Bank in Brookings, a national banking organization, to the business community, including, but not limited to, electronic draft capture and transaction processing for cardholder credit card purchases utilizing VISA USA, Inc. ("Visa"), MasterCard International, Inc. ("MasterCard"), American Express, Discover Card, Diners Club, Carte Blanche, and other mutually agreed upon merchant credit/debit cards, as well as the sale and lease of related equipment; and,

WHEREAS, ISO is a registered independent sales organization with Visa and a registered member service provider with MasterCard; and

WHEREAS, ISO and First American desire to enter into this Agreement to provide for the processing of electronic bank card services and related matters and the sale and/or lease of related processing equipment;

NOW, THEREFORE, in consideration of the mutual obligations and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the parties agree to the following:

1.    ***ISO.***  It is the intention of the parties hereto that ISO shall be an independent sales organization and contractor with respect to First American. ISO shall not be deemed an employee or agent of First American for any purpose whatsoever. ISO shall take all steps necessary to comply with First American's policies and procedures, but in doing so, ISO shall control the methods, efforts, and means of accomplishing such results. First American shall at no time assume or be responsible for the direction or control of ISO. ISO shall pay all taxes, including, but not limited to, all applicable state and federal income, franchise, and social security taxes associated with its business.

2.    ***ISO's Responsibility.***  First American hereby retains ISO on a non-exclusive basis to solicit merchants ("Merchants") to utilize First American's electronic capture and transaction processing service ("Service"). More specifically ISO shall perform the following:

2.1    Market and sell the Service as well as the related equipment in a professional manner to potential Merchants; provided, however, ISO shall not market the Service to Merchants who already subscribe to the Service except in those cases whereby the Merchant has published a request for bid or the Merchant has stated their intention to cancel their existing relationship with the Service. Conversely, First American agrees that no other ISO or sales agent representing First American shall be allowed to market the service to Merchants ISO has successfully solicited on behalf of First American.

2.2    Obtain a signed agreement with each Merchant to the Service on a form and pursuant to terms approved by First American ("Credit/Debit Transaction Agreement") and forward it to First American for acceptance, in its sole discretion. ISO shall assist in the completion of any Credit/Debit Transaction Agreement. No fee pursuant to Addendum "A" shall be paid to ISO unless and until the assigned Credit/Debit Transaction Agreement has been received and accepted by First American in Fort Worth, Texas, or other First American designated locations, and the other material requirements of this Agreement have been met.

*INDEPENDENT SALES ORGANIZATION AGREEMENT    Page 1*
*Draft 6/12/02*

Initials _____ / N2

EXHIBIT A Page 1 of 14

2.3     Provide the initial setup of the equipment used in providing the processing services, including but not limited to, the physical attachment of the equipment, the initial training of Merchant and Merchant's personnel, and the delivery of operating and training manuals to Merchant.

2.4     Follow up with Merchant to assure receipt of necessary start up materials. Upon request by any Merchant or First American, from time to time, ISO shall also train new personnel of Merchant, as needed.

2.5     Conduct an on-site inspection of each merchant submitting an application for the Service. The purpose of the inspection is to ensure that the Merchant is accurately reporting business conducted pursuant to the Service and that the average ticket and volume of Merchant is a reasonable approximation to the actual volumes reported. ISO shall incur all costs of on-site inspection. First American may direct an on-site inspection under this Section 2.5 at it's own or the Merchant's expense.

2.6     Make the initial customer contact concerning maintenance and service of Merchant's equipment and software.

2.7     On-going support services will be provided by First American to any Merchant to ensure that Merchants are continually apprised of the Service requirements and to remedy customer service problems encountered by Merchant. ISO is authorized to make contact either by telephone or in person immediately following a customer service request by a Merchant.

2.8     Communicate to First American any Merchant problems associated with the Service and resolution of the problem.

3.      **Credit/Debit Transaction Agreement**. ISO shall forward all completed Credit/Debit Transaction Agreements to First American for processing. First American shall have the right (i) not to contract with any Merchant, (ii) to terminate any existing Credit/Debit Transaction Agreement with any Merchant on the Service for any reasonable cause, (iii) to modify the form of Credit/Debit Transaction Agreement from time to time, and (iv) to contact any Merchant or prospective Merchant. First American agrees to consult with and notify the ISO in advance, of the termination of any Merchant that has been solicited by ISO. ISO shall only use forms and agreements provided by First American unless approved by First American in writing, which approval may be revoked at any time for reasonable cause. First American will print ISO's name on the Credit/Debit Transaction Agreements utilized by ISO under this Agreement. All Credit/Debit Transaction Agreements are proprietary to and the property of First American. All contracts are between First American and the Merchant. ISO shall not modify or alter the Credit/Debit Transaction Agreement or any forms or materials provided by First American, unless approved in writing by First American. All losses incurred by First American attributable to Credit/Debit Transaction Agreements, including losses due to chargebacks and non-payment of Merchant fees, shall be borne by First American.

4.      **Fees**.

4.1     ISO is entitled to charge Merchants certain pre-approved fees including but not limited to: (i) on-site inspection fees, (ii) equipment setup fees, (iii) Merchant application fees, and (iv) download fees. The amounts of fees, charges and reimbursements shall be determined by ISO. ISO will provide information regarding specific amounts charged to Merchants pertaining to the above fees on an as requested basis to First American.

4 .2    Any amount payable to First American resulting from equipment sales, supply sales by ISO shall be subject to right of setoff by First American for any amount owed under this agreement to it by ISO which is current or past due. The previous sentence does not apply to equipment or supply sales sold directly by Sales Personnel. A report will be furnished to ISO at least seven (7) days before any debit will take place and a good faith attempt will be made by both parties to resolve any disputes relating to past due amounts prior to the expiration of the seven (7) days notice.

Initials _____ / NR

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

EXHIBIT A Page 2 of 14

4.3     Twice each 12 month period, within 10 business days of ISO's written request, First American will forward to ISO all original reports received by First American from the authorization and settlement networks used to process transactions under the Credit/Debit Transaction Agreements.

4.4     ISO acknowledges that First American may be subject to price changes in its interchange and dues and assessments fees charged by Visa or MasterCard that are beyond its control. Such increases may be passed along to Merchants. First American agrees that it shall not increase any existing fees or impose any new fees on any Merchant from the effective date of a Credit/Debit Transaction Agreement until the Anniversary Date (defined below) of that particular Credit/Debit Transaction Agreement. First American shall use best efforts to provide written verification of any price changes to the extent that such price changes are the result of changes in the direct costs of First American's processing services. First American will provide ISO with a minimum of 10 days written notice of price increases applicable to Exhibit A of this agreement and will provide third party verification of cost increases. Failure to provide third party verification of cost increases to ISO within 30 days after delivery of the written notice of price increases will render said price increases null and void.

5.     **Agreement Term.** Unless terminated by written notice ninety (90) days prior to the end of the existing term, or as otherwise provided herein, this Agreement shall be in effect for three (3) years from the date on the signature page below. Thereafter, this Agreement will automatically renew for consecutive one (1) year terms. Following the initial three (3) year term, this Agreement may be terminated by either party effective at the end of a term without cause upon 90 days notice prior to the end of the then-current term. The transfer of sixty-six point sixty seven percent (66.67%) or more of the capital stock of First American, the transfer of all or substantially all of the assets of First American and Neil Randel ceases to hold the title of President of First American shall at ISO's option, release the ISO from it's obligations under the contract specifically including the penalties associated with the violation of Section 10.1, however, First American agrees to continue to pay ISO in accordance with Section 8 of this Agreement.

6.     **Termination of Agreement.** In the event of termination of this Agreement, First American may contact any Merchant in writing and explain that all direct support and future contacts regarding the Service shall be with First American or its designee and that ISO is no longer supporting the Service. Upon termination of this Agreement for any reason or no reason, First American will continue to pay ISO all amounts due to ISO under Section 8 of this Agreement attributable to Merchants approved by First American prior to the effective date of termination.

7.     **Termination for Cause.** Subject to termination rights provided herein, either party may terminate this Agreement for the reasons set forth in this Section 7, in accordance with the following procedure:  the non-breaching party shall send written notice of the breach to the breaching party. The breaching party shall have 30 days to cure the breach. Upon the breaching party's failure to cure, the non-breaching party shall send written notice of the breaching party's failure to cure, along with notification that the Agreement will be terminated 90 days from the date of the notification:

7.1     Fraud or misrepresentation either prior to the execution of this Agreement or during the term hereof, including, but not limited to, attempts to induce First American to execute or continue performance of any Merchant agreement that involves fraud or misrepresentation by ISO

7.2     Material noncompliance with applicable MasterCard, Visa or other credit/debit card bylaws, rules and regulations, or any policies, rules, and regulations of First American that have been provided by First American to ISO, or federal, state or local laws or regulations applicable to the Service.

7.3     The violation, omission, or breach of any material provision, covenant, duty, or obligation required under this Agreement.

7.4     Failure to give all applicable disclosures and maintain advertising and marketing materials in compliance with this Agreement and all laws, including, but not limited to, Truth-in-Lending Act, Regulation Z, the Uniform Commercial Code, and commercial banking rules and regulations.

*INDEPENDENT SALES ORGANIZATION AGREEMENT   Page 3*
Draft 6/12/02

Initials _____ / _____

EXHIBIT A   Page 3 of 14

7.5     Failure by ISO to timely install necessary equipment or provide necessary training to operate such equipment (other than due to equipment supply shortages or other circumstances out of the control of ISO), or the failure to conduct a site inspection of Merchant before submitting an application or after a request from First American.

7.6     Filing for bankruptcy, being placed into bankruptcy or receivership, dissolution or liquidation. Each party will provide un-audited operating financial statements Balance Sheet, Profit and Loss, Sources and Uses of Cash to the other party on an annual basis. The statements are to be provided no later that 45 days after the end of the calendar year.

7.7     Failure to obtain written authorization from First American as it relates to customized sales brochures, sales manuals, business cards, Merchant Application and Agreement and Merchant Processing Terms and Conditions.

7.8     Impossibility or impracticability of performance by First American due to changes in MasterCard, Visa, or other credit card company bylaws, rules, and regulations, or state or federal laws, rules or regulations, in which case termination shall be immediate upon such event and First American will release the ISO from it's obligations under the contract specifically including the penalties associated with the violation of Section 10.1 and First American shall assist ISO to the best of it's ability in converting the Merchants to another acquirer.

7.9     Termination, revocation, or suspension of any registration as an independent sales organization with Visa or as a member service provider with MasterCard or the breach of any agreement, failure to pay fees to, or failure to stay as an organization or member in good standing with Visa and/or MasterCard, in which case termination shall be immediate upon such event.

7.10    The assignment or attempted assignment of this Agreement without the prior written consent of the other party, which consent will not be unreasonably withheld.

7.11    Receipt by First American of a written directive from banking regulators, a member bank, or Visa, MasterCard, or other credit or debit card company to terminate, in which case termination shall be immediate upon such event.

7.12    Industry Attrition exceeds 20% in 3 consecutive Monthly Portfolios.

7.13    The parties understand and agree that the failure of any individual or sub-ISO retained by ISO to solicit Merchants under this Agreement ("Sales Personnel") to comply with the terms of this Agreement or any of the default provisions contained in this Section 7 will not be a cause for termination of this Agreement, but rather may result in the termination of that Sales Personnel's authority to solicit Merchants for First American under this Agreement.

8.    _Responsibilities of First American._

8.1 Card Processing Responsibilities. First American will provide authorization, data capture, settlement, and all related services to process the credit card transactions of all Merchants accepted by First American under this Agreement consistent with industry standards and using the same amount of care as First American uses with its own portfolio of merchants. First American will provide ISO with all relevant Visa and MasterCard rules.

8.2 Portfolio Purchase Program

8.2.1 Definitions

For purposes of this Agreement, the following definitions shall apply:

_INDEPENDENT SALES ORGANIZATION AGREEMENT_   _Page 4_
Draft 6/12/02

Initials _____ / _____

"*Acquisition Date*" means the tenth business day of the first month following the Holding Period.

"*Acquisition Price*" means the amount paid on the Acquisition Date by First American to ISO for each Transaction Agreement based on the monthly net Merchant revenue generated during the last month of the Holding Period.

"*Anniversary Date*" means the date that is 11 months after the Acquisition Date.

"*Excess Revenue*" means the amount, if any, by which the aggregate revenue for the preceding 12 months, calculated as of the Anniversary Date, exceeds the revenue on which the original Acquisition Price was based.

"*Holding Period*," means the period of two months immediately following the Origination Month.

"*Holdback Amount*" means the percentage of the Acquisition Price that is held back from ISO pending the calculation of 12 months of net revenue attributable to a Monthly Portfolio.

"*Industry Attrition*" means an assumed percentage of decline in month-to-month revenues to be derived from the Monthly Portfolio revenues. The parties will agree that degradation of the actual Monthly Portfolio revenues attributable to the termination of the Transaction Agreement due to the following events will not be included in the calculation of Industry Attrition:  First American's breach of the Transaction Agreement.

"*Monthly Portfolio*" means the monthly residual income (total revenue less total expense detailed in Exhibit A) attributable to the Credit/Debit Transaction Agreements that have generated revenue to First American in the second month of the Holding Period, acquired by ISO under this Agreement and as reported on the income and expense report for each unique office number to ISO.

"*Origination Month*" means the calendar month during which a Credit/Debit Transaction Agreement is accepted and/or approved for processing by First American.

"*Reserve Payment*" means the payment by First American calculated based on the monthly residual income (total revenue less total expense) attributable to Credit/Debit Transaction Agreement transactions in the first month of the Holding Period and paid on, or about, the 10th business day of the second month of the Holding Period into a bank account in ISO's name.  ISO will pay First American a 15% APR for the reserves paid by First American up until the Acquisition Date.

8.2.2.  Acquisition of Contracts.

A.    Once First American accepts a Transaction Agreement and is added into the Monthly Portfolio, First American agrees that under no circumstance will First American decline to purchase the right, title and interest to the residual income attributable to the Monthly Portfolio, nor will it decline to make the agreed-upon payments to ISO on the Acquisition Date and the Anniversary Date.

Upon First American's acceptance of a Transaction Agreement, ISO will undertake all tasks necessary to enable First American to provide the Services of First American.  On the Acquisition Date, ownership of the right, title and interest to the Monthly Portfolio will transfer to First American upon payment by First American of the Acquisition Price to ISO.

B.    In consideration for the origination and transfer of the Monthly Portfolio by ISO, First American will make the following payments to ISO:
i) 50% payment of the estimated Acquisition Price (the Reserve Payment) will be paid to ISO by First American in the second month of the Holding Period.  The estimate will be calculated as follows:  The net revenue of the Monthly Portfolio in the first month of the Holding Period multiplied by 30;

*INDEPENDENT SALES ORGANIZATION AGREEMENT*   **Page 5**
Draft 6/12/02

Initials _____ / _____

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

*EXHIBIT A Page 5 of 14*

ii) the balance of the Acquisition Price less the Holdback Amount will be deposited by First American into ISO's bank account on the Acquisition Date less any interest due from the Reserve Payment.

iii) the final payment will be due on the Anniversary Date based on the average revenues during the second month of the Holding Period plus the average revenues of the 11 months immediately following the Holding Period.

First American acknowledges that ISO will be forwarding money to Sales Personnel based on the warranty of First American that First American will purchase each Monthly Portfolio and make payments to ISO on the Acquisition Date and Anniversary Date. Therefore, in the event First American fails to fund the purchase of the Monthly Portfolio on the Acquisition Date or the Anniversary Date, First American agrees to liquidated damages in the amount of the sum of: 1) the residual income generated by the Monthly Portfolio earned by First American beginning on the date First American fails to make such Acquisition Date or Anniversary Date payment and ending on the date all amounts due are received by ISO; PLUS 2) the amount of the unpaid Acquisition Price, Monthly Portfolio Price, and Reserve Payment. In addition, if payments due on the Acquisition Date or Anniversary Date are not received by ISO within 90 days of such dates: A) ISO shall have the right to solicit Merchants on which it was not fully paid and move such Merchants to a third party credit card processor without penalty, and First American shall cooperate in the transfer of such Merchants, and B) the provisions of Sections 9 and 10 shall not apply. The parties acknowledge that this is not a penalty but a reasonable estimation of the damage incurred by ISO as a result of First American's failure to pay.

8.2.3    Reserves

A.    The parties agree that Industry Attrition will equal 15%. A 15% "Holdback Amount" will be withheld from the Acquisition Price payable to ISO. The Holdback Amount will be paid by First American on the Anniversary Date in accordance with the provisions set forth below. On the Anniversary Date, the following calculations and payments will be made:

(1) First American will pay Holdback Amount reserve to ISO on a discounted basis of 1.5% discount for every 1% the actual Monthly Portfolio attrition exceeds the Industry Attrition. For example, for every 1% increase in the actual Monthly Portfolio attrition over the Industry Attrition, ISO shall receive 1.5% less of the 15% Holdback Amount or 13.5% and so on until the Holdback Amount is depleted.
(2) If the actual Monthly Portfolio attrition is less than the Industry Attrition of 15%, ISO will be entitled to all Holdback Amount reserve plus a bonus of 1% of the Acquisition Price for each 1.5% the actual Monthly Portfolio attrition is lower than the Industry Attrition.

B.    If the actual Monthly Portfolio revenues calculated as an average of the previous 12 months prior to the Anniversary Date are greater than the estimated revenues calculated on the Acquisition Date, First American will tender further payment to ISO on the Excess Revenue calculated in the same manner utilized for the Acquisition Price.

Example:  If the Monthly Portfolio revenues are projected to be $50,000.00 for a particular Anniversary Date and the average actual Monthly Portfolio revenues are $60,000.00, then ISO will be entitled to payment calculated on the Excess Revenue by a factor of 30 times, as follows: Excess Monthly Portfolio Revenues = $10,000.00 multiplied by 30 equals $300,000.00 paid to ISO by First American on the Anniversary Date for the Excess Monthly Portfolio Revenues.

C.    First American and ISO both will be entitled to direct recourse against Sales Personnel. ISO will assign to First American the rights and remedies available to ISO under agreements between Sales Personnel and ISO. This will entitle First American to obtain injunctions or other legal recourse that will stop, curtail or forbid the Sales Personnel from reselling services, transferring to another processor or communicating with the proprietor of the Transaction Agreement business that was acquired by First American.

*INDEPENDENT SALES ORGANIZATION AGREEMENT    Page 6*
Draft 6/12/02

Initials _JM_ / _NC_

## EXHIBIT A (Part 1)

Buy rates set forth in Part 1 below are the expenses used in calculating the monthly residual income, as referenced in the definition of "Monthly Portfolio" set forth in Section 8.2.1 of the Agreement.

| ITEM | Expenses |
|---|---|
| **Interchange Fees** | |
| Interchange, Dues & Assessments | Pass-through |
| **Base I - Auth. & Capture** | |
| Transaction fee | $0.06 |
| Transaction fee_Mid-Qual | $0.06 |
| Transaction fee_Non-Qual | $0.06 |
| Per batch | $0.00 |
| Per watts surcharge | $0.00 |
| Wireless surcharge | $0.07 |
| **Base II - Settlement** | |
| Per settled transaction | $0.02 |
| **Monthly Statement Fees** | |
| Per merchant on file | $0.53 |
| Per merchant statement | $0.17 |
| Per postage | Pass-through |
| **Voice/AVS authorization fee** | |
| Per voice auth. | $0.60 |
| **Ancillary fees, etc.** | |
| Per Chargeback | $9.00 |
| Per Retrieval fee | $3.00 |
| Per NSF fee / ACH Reject | $30.00 |
| Monthly minimum | $0.00 |
| Annual fee* | $0.00 |
| Merchant equipment swap | $1.75 per month |
| Encryption fee | $10.00 |
| US Wireless Data - Activation fee/setup | $50.00 |
| Starter kit (merchant) | $1.06 |
| **Debit Program** | |
| Transaction fee | $0.06 |
| Network fee | Pass-through |
| Debit statement fee | $1.06 |
| **EBT Program** | |
| EBT statement fee | No Charge w/Debit |
| EBT transaction fee | $0.06 |
| **E-Commerce Solution** | |
| Gateway per month | $10.00 |
| First View per month | $3.50 |

*All Merchant Annual Fees will be billed in the second month of the Holding Period and 1/12 of the amount is included in the Acquisition Price.

First American

AmericaOne:

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

EXHIBIT A  page 7 of 14

**EXHIBIT A – Part 2**

Buy rates set forth in Part 2 below will be paid by First American to ISO on or about the 10th business day of each month for the previous month's transactions on all Credit/Debit Transaction Agreements accepted by First American, for as long as First American is receiving such amounts from accepted merchants. Such payments will be in addition to the amounts payable to ISO pursuant to Section 8.2 of the Agreement. At the time of each payment, First American will remit a report to ISO setting forth the calculations used in arriving at the amounts paid. The payment of such amounts to ISO will survive termination of the Agreement.

| ITEM | Expenses |
|---|---|
| **Check Guarantee/Verification (TBD)** | |
| App fee | $0.00 |
| Retail buy rate | 1.19% + $.25/Trans |
| Max. check amount | $1,000.00 |
| Rest. Fast food buy rate | 1.19% + $.10/Trans |
| Rest. Max. check amount | $300.00 |
| Statement fee | $0.00 |
| Monthly min. | $25.00 |
| **A La Carte Features** | |
| Stop payment cov. | $0.07 |
| Bank fee reimbursement | $0.11 |
| No fault cov. | $0.05 |
| 7 day claim pay | $0.05 |
| Floor log | $0.08 |
| **ATM Services** | |
| Monthly access fee | $25.00 |
| Surcharge Income | $0.00 |
| Transaction Income/Backend | $0.10 |
| **Other** | |
| Sign up bonus - new check Guar. Acc. | $50.00 |
| Conversion bonus - new check Guar. Acc. | $100.00 |
| **Non-Bankcard** | |
| AMEX Activation Bonus | $25.00 |
| Discover Bonus | $15.00 |
| **Leasing Program** | |
| Merchant App fee | $25.00 |
| Premium | 0.0269 |
| "A" | 0.0299 |
| "B" | 0.0319 |
| "C" | 0.0349 |
| "D" | 0.0399 |
| "Z" | 0.047 |

First American: _____

AmericaOne: _____

INDEPENDENT SALES ORGANIZATION AGREEMENT
Exhibit A Pricing
Draft 6/12/02

EXHIBIT A Page 8 of 14

D.    First American will be responsible for any and all losses attributable to Merchants, whether such losses arise from chargebacks, Merchant fraud, or nonpayment of fees by Merchants. In no event will any Merchant losses incurred by First American be deducted from any monies due to ISO.

**8.2.4. Pricing.**

A.    All card processing pricing is set forth on the attached Exhibit A. In order to maintain the integrity of the value of each Monthly Portfolio , First American will be prohibited from raising any fee (excluding interchange fees, VISA and MasterCard dues and assessments) charged to any Merchant until after the Anniversary Date.

B.    The Acquisition Price of each Monthly Portfolio will be calculated as follows:  Monthly Portfolio revenues that are generated in the second calendar month of the holding period, multiplied by 30.

**8.2.5 Audits.** First American will deliver electronic reports daily and summaries of such daily reports monthly to ISO as they are received by First American from First American's third party processor(s) and/or settlement institution(s) with regard to all revenues and data fields generated on each Monthly Portfolio. ISO will be entitled to audit such records from time to time at its own expense. First American will be responsible for preparing and maintaining all accounting records for the Monthly Portfolios and will provide daily and monthly accountings to ISO. At the time of each payment to ISO, First American will deliver a statement setting forth the computations used to calculate such payments.

**8.2.6 Survival.** Sections 8.2.2.B, 8.2.3.A, 8.2.3.B, 8.2.3.C, and 8.2.4 will survive termination of this Agreement.

9.    ***Confidentiality.*** ISO and First American shall treat as confidential all information concerning the business of First American and ISO, their affiliates, the Service, or any Merchant that may come to their attention during the course of performance hereunder. Such confidential information shall include, without limitation, any Trade Secrets (as hereinafter defined), the Credit/Debit Transaction Agreement, policies and procedures, processes, programs, know-how, financial information, pricing models or information, Merchant names, customer lists, Merchant lists, personnel information, and computer and other technical data, and includes, but is not limited to: (1) the sales records, profit and performance reports, pricing manuals, sales manuals, training manuals, selling and pricing procedures and financing methods of First American, ISO or any member bank; (2) strategic data, including marketing and development plans, forecasts and forecast assumptions and volumes, and future plans and potential strategies of First American, ISO or any member bank; and (3) customer data, including customer lists, names of customers and their representatives, data provided by or about prospective, existing or past customers, customer service materials, and the type, quantity, and specifications of products purchased, leased or licensed by customers of First American, ISO or any member bank. Further, upon the termination of ISO's engagement hereunder, ISO shall deliver to First American and First American shall deliver to ISO all pricing models, agreements, customer lists, papers, documents and other property that it has received and all copies thereof, containing any confidential information. The obligation of confidentiality hereunder shall survive termination of this Agreement, but shall apply only to those Merchants for which ISO is being paid under the terms as outlined in Section 8 of this Agreement.

9.1    For purposes of this Agreement, the term (i) "affiliates" shall include any person or entity that directly, or indirectly, whether or not through one or more intermediaries, controls, is controlled by, or is under common control with ISO or First American, and (ii) "control" shall mean the direct or indirect ability to direct or cause the direction of the management and policies of the specified party, whether through ownership, by contract, or otherwise.

9.2    For purposes of this Agreement, the term "Trade Secrets" shall mean the whole or any portion or phase of any financial, scientific or technical information, model, design, process, network, list, procedure, formula, or improvement that is valuable and not generally known to competitors of First American, ISO or any member bank. Trade Secrets shall include, without limitation, the specialized information and technology First American, ISO or any member bank may develop or acquire with respect

*INDEPENDENT SALES ORGANIZATION AGREEMENT    Page 7*
Draft 6/12/02

Initials ___/___

EXHIBIT A    Page 9 of 14

to any software, program, source code, object code, listing, printout, flow chart, algorithm, research and development material, programming note, programming aid, data specification, test result, and related documentation

9.3 All sales manuals, customer lists, models, agreements, Trade Secrets, software and other media provided to ISO shall at all times remain the property of First American. Upon the termination or expiration of the Agreement, ISO shall immediately return all sales manuals, price lists, price models, customer lists, mailing lists, and any and all other documents, materials, and media however recorded. First American shall have the right to peaceably and reasonably enter upon the premises of ISO and the Sales Personnel, provided First American provides ISO 72 hours notice and enters during regular business hours to recover said proprietary items upon termination or expiration of the Agreement. First American shall have the right to reasonably inspect the premises of ISO and Sales Personnel to insure that said proprietary items are properly protected from disclosure, damage, or theft, at any reasonable time during the performance of the Agreement.

9.4 ISO acknowledges that information, including but not limited to confidential information concerning First American, any Merchant, but shall apply only to those Merchants for which ISO is being paid under the terms as outlined in Section 8 of this Agreement, Services, any current or proposed program, any Merchant data base, and any Merchant account, but shall apply only to those Merchants for which ISO is being paid under the terms as outlined in Section 8 of this Agreement, are proprietary and confidential and shall remain the property of First American. The Confidential Information shall be used only as provided in this Agreement and only to the extent necessary for each party to fulfill responsibilities under this Agreement. Each party shall treat such information as confidential and shall not disclose this information or compete with the other party or otherwise make available the Confidential Information to any third party except as necessary to carry out its obligations under this Agreement and only to the extent of the particular Merchant files. First American hereby agrees to treat all information, whether deemed confidential or not, furnished by ISO to First American in accordance with the standards established in this paragraph.

10. *Covenant Not to Solicit:* ISO acknowledges that during the performance of this agreement it will acquire information and contacts which are confidential and valuable to First American. Consequently, in order to protect the interests of First American in its Merchant base, ISO agrees to the following.

10.1 For a period of five years following the termination date of this Agreement, ISO agrees that neither it nor any of its affiliates, owners, employees, officers, directors or partners of ISO, or anyone acting at ISO's direction, will enter into an agreement with any Merchant from whom ISO or its Sales Personnel previously and successfully solicited an application on behalf of First American or member bank and on which First American has paid ISO the amounts due on the Acquisition Date and the Anniversary Date. Conversely, First American agrees that no other ISO or sales agent representing First American shall be allowed to market the Service to a Merchant successfully solicited by ISO on behalf of First American. Failure by either party to honor its obligations in accordance with the terms of this Agreement shall result in the immediate cancellation of the other party's Covenant Not to Solicit and all penalties associated with the violation of the Covenant Not to Solicit.

10.2 The parties agree that it is impossible to ascertain or estimate the exact amount of damage which both parties may sustain by reason of a breach of this Section 10, and the sum specified herein below is agreed on as liquidated damages for the injury suffered and not as a penalty. In the event of breach of this provision, the breaching party will pay to the non-breaching party, within thirty (30) days of such breach, liquidated damages of the greater of (a) 30 times the latest monthly revenue to First American from the Merchant, or (b) $1,000.00. Both parties agree that a breach or threatened breach of the non-solicitation provisions of this Agreement could cause irreparable harm and, as a consequence, the non-breaching party will be entitled to obtain injunctive or other equitable relief against the breaching party or any of its affiliates to prevent the continued, actual, or prospective breach hereof.

10.3 It is agreed that First American retains the right to encourage other entities and individuals to market the Service, and shall be able to do so in any area in which ISO may be marketing the

*INDEPENDENT SALES ORGANIZATION AGREEMENT Page 8*
Draft 6/12/02

Initials

EXHIBIT A Page 10 of 14

Service. It is expressly understood that ISO does not have any exclusive rights for marketing this or any other service or product. First American agrees not to enter into any agreement with any third party under which such third party solicits merchants and is compensated in a manner similar to that outlined in Section 8 of this Agreement for a period of one year from the date of this Agreement, and First American will not directly or indirectly compensate any third party similar to the compensation method set forth in Section 8 of this Agreement.

10.4    During the term of this Agreement and for 2 years after termination for any reason, First American shall not, directly or indirectly, attempt to induce any Sales Personnel to render Services for First American or for any third party, nor enter into any agreement with any Sales Personnel. Both parties agree that a breach or threatened breach of this Section could cause irreparable harm and, as a consequence, the non-breaching party will be entitled to obtain injunctive or other equitable relief against the breaching party or any of its affiliates to prevent the continued, actual, or prospective breach hereof..

If any one or more provisions contained in this Section 10 shall be held unenforceable, the parties agree to reform such terms and the court shall have the authority to reform the terms of the covenant and such terms as modified shall be enforceable.

11. _Indemnity._    Each party hereby indemnifies and holds harmless the other party and any member bank from and against any and all losses, suits, claims, costs, damages, expenses and liabilities, including reasonable attorneys' fees and costs of court resulting from arising out of, or in connection with that party's intentional or negligent performance or breach of performance hereunder, that were not the fault of that party. Without limiting the foregoing, each party indemnifies and holds the other party and the member bank harmless from any loss incurred as a consequence of fraud, chargeback losses or similar losses from fraud, intentional or negligent misrepresentation, impropriety or other activities of Merchant, where the party participated in the activity or had actual knowledge that such fraud, misrepresentation or impropriety existed.

12.    _Sales Personnel of ISO_.

12.1    ISO shall provide First American with a written list of all Sales Personnel, their social security numbers and the addresses and telephone numbers of the principal office of all Sales Personnel regardless of whether said sales personnel are employees of ISO or independent contractors of ISO. ISO shall update Sales Personnel information to include any change in address or telephone number and provide First American promptly with the update. Furthermore, ISO shall provide First American with any other information which is reasonably necessary for the performance of this Agreement or compliance with Visa, MasterCard, or other credit/debit card bylaws, rules, and regulations upon request.

12.2    ISO shall obtain authorization for a credit check from all Sales Personnel and will conduct such credit check. ISO will remit a copy of any such credit check to First American upon request.

12.3    ISO shall use its best efforts to properly train its Sales Personnel so that such persons act at all times in a professional manner while marketing the Services and products of First American.

12.4    Sales Personnel are subject to review and exclusion by First American at any time for any reason, with or without cause, provided ISO and First American mutually agree upon the exclusion.

12.5    ISO shall be responsible for compliance by Sales Personnel with all bylaws, rules, regulations, statutes, and laws of Visa, MasterCard that have been provided to ISO by First American, any other applicable credit card company, any association, court, agency, legislature, or other law or rule making authority. ISO and its Sales Personnel shall not use the Visa, MasterCard, or other credit or debit card trademark nor any other trademark without the prior written consent of First American and the member bank, if appropriate.

12.6    ISO and its Sales Personnel shall not undertake nor omit any actions which if undertaken or omitted by First American will amount to a violation of or breach of Visa, MasterCard, or other credit or debit card rules or regulations or any agreement which First American has with a member bank.

_INDEPENDENT SALES ORGANIZATION AGREEMENT    Page 9_
Draft 6/12/02

Initials _____

EXHIBIT A  Page 11 of 14

13.    *Miscellaneous*.

13.1    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas. The section headings contained herein are for purposes of convenience only, and shall not be deemed to constitute a part of this Agreement or to affect the meaning or interpretation of this Agreement in any way.

13.2    Except as otherwise provided herein, all notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given, if delivered personally, delivered via overnight courier, given by telecopy, facsimile, prepaid telex or telegram or mailed first class, postage prepaid, certified United States mail, return receipt requested, to the party to receive such notice, request, demand or communication at such party's address set forth below or elsewhere in this Agreement; provided that, any party may change its address for notice by giving to the other party written notice of such change. Any notice given under this Section shall be effective (i) if delivered personally, when delivered, (ii) if sent by telecopy, facsimile, telex or telegram, 24 hours after sending, and (iii) if mailed, 48 hours after mailing.

> If to First American;    First American Payment Systems, L.P.
> 301 Commerce St, Suite 2000
> Fort Worth, Texas  76102
> Attention: President
>
> If to ISO:    Address on First Page - Attn: David McMackin

13.3    In the event either party is unable to perform its obligations hereunder in a timely fashion due to causes that are beyond its control, including without limitation strikes, riots, earthquakes, epidemics, war or fire, power failure, machine, electronic or mechanical, breakdown, computer associated equipment outage, network failure, or any other catastrophe rendering its data processing center wholly or partially inoperable for a period in excess of forty eight (48) hours, then liability for any direct, indirect, or consequential loss or damages which results shall not exceed the total revenues paid by Merchants to First American for the six calendar months preceding the event.

13.4    In the event a party must hire a lawyer, bring suit or otherwise seek enforcement of any provisions of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all attorneys' fees, court costs, expert witness fees, and other costs of enforcement in connection herewith and therewith.

13.5    Each party represents and warrants that it has full right, power, legal capacity and authority to enter into and perform its obligations under this Agreement and that its entering into this Agreement does not violate any agreement, contract, understanding, rule, order, or judgement to which it may be subject.

13.6    All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns; provided however, that neither party shall be entitled to assign its rights or obligations hereunder, nor contract with any other entity to perform any of its obligations hereunder without the prior written approval of the other party, which approval shall not be unreasonably withheld. Any transfer of fifty percent (50%) or more of the voting or capital stock of either party or all or substantially all of the assets or business shall be deemed an assignment under this Agreement requiring consent of the other party.

13.7    This Agreement may be amended, modified, superseded or canceled, and any of the terms, provisions, covenants or conditions hereof may be waived, only by a written instrument executed by all parties hereto, or, in the case of a waiver, by the party waiving compliance. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect the right to

*INDEPENDENT SALES ORGANIZATION AGREEMENT    Page 10*
Draft 6/12/02

Initials _FM_ / _Nil_

EXHIBIT A PAGE 12 of 14

enforce the same. No waiver by any party of any condition contained in this Agreement, or of the breach of any term, provision or covenant contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach, or as a waiver of any other condition or of the breach of any other term, provision or covenant.

13.8    This document, together with any addendum or related documents referred to in this Agreement, constitutes the entire understanding and agreement of the parties with respect to the subject matter of this Agreement, and supersedes any and all prior agreements, written or oral, arrangements and understandings relating to the subject matter hereof.

13.9    Should any provision of this Agreement be held unenforceable or invalid under the laws of the United States of America or the State of Texas or under any other applicable laws of any other jurisdiction, then the parties hereto agree that such provision shall be deemed modified for purposes of performance of this Agreement in such jurisdiction to the extent necessary to render it lawful and enforceable, or if such a modification is not possible without materially altering the intention of the parties hereto, then such provision shall be severed here from for purposes of performance of this Agreement in such jurisdiction. The validity of the remaining provisions of this Agreement shall not be affected by any such modification or severance.

13.10    Notwithstanding any other provision of this Agreement, neither party shall be liable to the other party for consequential or incidental damages, including, but not limited to, lost profits or damage to reputation, as a result of any breach of this contract or failure to perform hereunder.

13.11    The titles and headings in this Agreement are solely for convenience and are not intended to be enforceable or interpretive as a provision of this Agreement.

13.12    Nothing in this Agreement shall create a partnership or joint venture between the parties, and the services provided hereunder shall be as independent contractors.

13.13    This Agreement shall supersede and replace any and every preexisting contract, agreement, discussion, and negotiation between the parties relating to the subject matter hereof.

13.14    The parties shall execute all additional instruments and other documents, to perform all additional acts and to cooperate in every other way, to carry out this Agreement or the intent thereof.

13.15    All covenants of the parties hereto shall survive the expiration or termination of this Agreement. Time is of the essence.

13.16    The parties acknowledge that First American is not the manufacturer of any equipment provided to the ISO or associated Sales Personnel for sale, rental, or lease. Unless otherwise expressly provided in an extended warranty or maintenance agreement, all equipment is acquired as is, where is, and FIRST AMERICAN EXPRESSLY DISCLAIMS ALL WARRANTIES EXPRESS OR IMPLIED OF ANY KIND INCLUDING WARRANTIES OF MERCHANTABILITY OF FITNESS FOR A PARTICULAR PURPOSE.

13.17    The names First American Payment Systems, First American, SecurChex, Merimac, and other names used by First American in connection with its business are trademarks of First American and the sole and exclusive property of First American and other than as provided in this Agreement cannot be used by ISO or any person without the prior express written consent of First American, which consent can be revoked at any time.

13.18    All disputes, claims, or other matters in question between the parties arising out of this Agreement, other than claims involving injunctive relief, shall be decided by non-binding arbitration to be conducted at a neutral site, pursuant to the then-current <u>Commercial Arbitration Rules</u> of the American Arbitration Association.

*INDEPENDENT SALES ORGANIZATION AGREEMENT    Page 11*
Draft 6/12/02

13.19    No public announcement or press release relating to the existence or contents of this Agreement may be made by either party without the prior written consent of the other party.

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the 20 day of _____ VYNE _____, 2002.

FIRST AMERICAN PAYMENT
SYSTEMS, L.P., by Quick Processing,
L.L.C., General Partner

By: _____

NEIL RANDEL    PRESIDENT/CEO
(Print Name and Title)

America One Payment Systems, Inc.

By: _____

DAVID McMALKIN / PRES.
(Print Name/Title if applicable)

Tax I.D.:    77-053159

INDEPENDENT SALES ORGANIZATION AGREEMENT    Page 12
Draft 6/12/02

JS 44 (Rev. 12/07) (cand rev 1-16-08)
**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

**I. (a) PLAINTIFFS**

AMERICAONE PAYMENT SYSTEMS, INC.

**DEFENDANTS**

FIRST AMERICAN PAYMENT SUSTEMS, L.P.

**(b)** County of Residence of First Listed Plaintiff  Santa Clara
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant      Fort Worth, Texas
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Gary E. Garnel, Esq.
2995 Woodside Road, Ste. 400
Woodside, CA 94062
(650) 851-1824

Attorneys (If Known)

E-FILING C08  01818  PVT

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | ☐ 871 IRS—Third Party | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | ☐ 900 Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities— | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Determination |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | Under Equal Access |
| | ☐ 446 Amer. w/Disabilities— | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus — | | to Justice |
| | Other | | Alien Detainee | | ☐ 950 Constitutionality of |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | State Statutes |
| | | | Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332(a)

Brief description of cause:
Breach of Independent Sales Organization Agreement

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ 75,000+

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes ☐ No

**VIII. RELATED CASE(S)
IF ANY**

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)**
(PLACE AND "X" IN ONE BOX ONLY)

☐ SAN FRANCISCO/OAKLAND          ☒ SAN JOSE

DATE
April 2, 2008

SIGNATURE OF ATTORNEY OF RECORD